**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ERC SPECIALISTS, LLC,** | **COMPLAINT** |
| Plaintiff, | Case No. _____ |
| -against- | The Honorable _____ |
| **FRAUD.NET, INC.,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff ERC Specialists, LLC (ERCS), for its complaint against Fraud.net, Inc. (Fraud.net) alleges as follows:

**SUMMARY**

1.　In this action for breach of contract and fraudulent inducement, Plaintiff ERCS seeks to recover monetary damages based on Defendant Fraud.net's intentionally false and misleading statements about the services it could and would provide to ERCS in support of ERCS' assistance to thousands of business owners nationwide seeking to access government services for pandemic recovery.

2.　In summary, to induce ERCS to enter into a lucrative contractual arrangement, Fraud.net falsely misrepresented that its existing fraud detection services would meet ERCS' needs and expectations for new clients. Shortly after ERCS signed the agreement, however, Fraud.net's own "Customer Success Manager" Tony Ferrano candidly admitted the promised services did not exist. When confronted with this information, Fraud.net executives failed and refused to process ERCS' request to terminate the contract, and also failed and refused to return any portion of ERCS' payment.

3. Accordingly, in this action ERCS seeks: a judicial declaration that the contract was terminated by no later than October 12, 2023; recovery of monetary damages (including punitive damages) in an amount to be proven at trial; pre- and post-judgment interest; and all other relief the Court deems just and appropriate.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to Article III, Section 2 of the United States Constitution and 28 U.S.C. section 1332 in that ERCS and Fraud.net are citizens of two different states and the amount in controversy exceeds $75,000.

5. Venue in the Southern District of New York is proper pursuant to 28 U.S.C. section 1391(b) in that Fraud.net maintains a principal place of business in New York, New York, and certain of the acts or omissions, practices, and courses of business comprising the unlawful acts alleged in this complaint occurred within this judicial district.

## PARTIES

6. Plaintiff ERC Specialists, LLC (ERCS) is a limited liability company with its principal place of business in Orem, Utah.

7. Defendant Fraud.net, Inc. (Fraud.net) is a privately held company incorporated in the State of Delaware with a principal place of business in New York, New York.

## FACTUAL ALLEGATIONS

8. ERCS is a tax service organization that specializes in understanding and maximizing the CARES Act Employee Retention Credit (Retention Credit) for businesses in the United States that were negatively affected by COVID-19.

9. Because the Retention Credit is newly available only in the last few years, the tax services provided by ERCS are both in high demand and subject to significant scrutiny by the Internal Revenue Service.

10. As a result, ERCS determined it should implement rigorous protocols to detect and guard against fraud or other misconduct by third parties seeking to utilize ERCS' services to support illegal claims for Retention Credits.

11. In or around May 2023, ERCS and Fraud.net first discussed services Fraud.net purported to offer to assist ERCS with the detection of, and protection against, fraud. Fraud.net's sales representative, or "Solutions Consultant," John Ging, represented that Fraud.net could provide (i) a rules-based search engine with rules configured specifically to meet ERCS' needs and (ii) access to existing databases compiled by "big name" clients like AT&T and others, both of which were supposedly specifically geared toward the detection of potentially fraudulent activities of claims (e.g., fake names, addresses, or social security numbers, IP addresses or devices previously used in fraudulent schemes, etc.).

12. Based on Fraud.net's representations of the products and services it could provide, and Fraud.net's promises that ERCS' expectations and needs could be satisfied by Fraud.net with only minimal input required from ERCS, ERCS entered into a contract with Fraud.net. A true and correct copy of the purchase order signed by ERCS and Fraud.net, executed on June 9, 2023 (Contract), is attached hereto as Exhibit 1.

13. Pursuant to the Contract, Fraud.net offered to provide, and ERCS agreed to purchase, among other services, an Assisted Intelligence (AI)-assisted application called "Know Your Customer" (KYC Service).

14. In the Contract, Fraud.net promised that its KYC Service would assist clients like ERCS to "assess[] the risk of approving an application or new account requested by a consumer." (Ex. 1 hereto at 1.)

15. Fraud.net further promised: "Fraud.net will review [an] application or new account for anomalies as well as against [Fraud.net's] consortium of fraudulent identifies, emails, addresses, and devices." (*Id*.) Fraud.net represented that its KYC Service "checks" would include: "Fraud Check, Address Verification, Email Verification, Telephone Verification, Device Verification, IP Verification, [and] TIN [Tax Identification Number] Check." (*Id*.)

16. In addition to its KYC Service, Fraud.net offered to provide, and ERCS agreed to purchase, access to Fraud.net's "API Appstore," which Fraud.net described as its "growing marketplace of third-party fraud prevention data and technology partners," which were supposedly "fully integrated into [Fraud.net's] Platform." (Ex. 1 hereto at 2.)

17. Fraud.net also offered to provide, and ERCS agreed to purchase, access to Fraud.net's "Support Plan," which promised: "24/7 self-help resources including how-to videos, documentation, and knowledge center, [u]nlimited support tickets, [s]ystem health status and notifications, [and] [e]mail support." (Ex. 1 hereto at 2.)

18. Fraud.net charged, and ERCS paid, $109,900 for the contracted KYC Service (minimum 60,000 calls), API Appstore, and Support Plan for the first year of the Contract's initial three-year term (Initial Term). (Ex. 1 hereto at 2 (including "Committed Use Discount"), 3-4.)

19. During the Initial Term, for KYC Service calls in excess of the mandated minimum 60,000, Fraud.net would charge, and ERCS would pay, a per-call charge with tiered pricing dependent on volume. (*Id*. at 4-5.) In the second and third years of the Contract, all

4

KYC Service calls would be charged based on the same tiered pricing dependent on volume. (*Id*. at 4.)

20. The contractual relationship between ERCS and Fraud.net was also subject to a Master Service Agreement, executed on June 9, 2023 (Master Agreement), a true and correct copy of which is attached hereto as Exhibit 2.

21. Under the Master Agreement, Fraud.net was obligated to provide all Professional Services (defined as "installation, implementation, data migration or other consulting services") (Ex. 2 hereto at ¶1(14)) set forth in any "SOW" (defined as "each statement of work, engagement letter, service brief in a Purchase Order, or other writing signed by Fraud.net and Customer that describes the Professional Services provided by Fraud.net") (*id.* at ¶1(21))—including the Contract at issue here—"in a professional and workmanlike manner consistent with good industry standards and practices" (*id*. at ¶6(3).)

22. Pursuant to the Master Agreement, the agreed-on remedy for Fraud.net's failure to provide Professional Services "in a professional and workmanlike manner consistent with good industry standards and practices" was for Fraud.net to attempt to "re-perform" the services or, "if Fraud.net is unable to do so, terminate the applicable SOW and refund that portion of any Fees paid to Fraud.net . . . that correspond to the allegedly defective Professional Services." (Ex. 2 hereto at ¶6(3).)

23. Shortly after the Contract was executed by ERCS and Fraud.net, Fraud.net assigned "Customer Success Manager" Tony Ferrano to act as the account manager for ERCS. Tony Ferrano admitted to ERCS that the Professional Services Fraud.net had contracted to provide ERCS would not perform as promised. When asked specially about the promised

customized rules-based database and access to existing customer fraud-detection databases, Tony Ferrano stated, "Oh, no, we don't have that."

24.     Soon thereafter, Tony Ferrano's employment was apparently terminated by Fraud.net.  On information and belief, Tony Ferrano was terminated, at least in part, because he was honest with ERCS that Fraud.net's promised Professional Services under the Contract would not meet ERCS' needs or expectations.

25.     On information and belief, Fraud.net knew, prior to ERCS agreeing to contract with Fraud.net, that Fraud.net's services would not perform as promised and would not be sufficient to meet ERCS' needs or expectations.

26.     On information and belief, Fraud.net misrepresented to ERCS that Fraud.net's services would perform as promised, and further misrepresented that Fraud.net's services would be sufficient to meet ERCS' needs and expectations, for the purpose of inducing ERCS to enter into a contract with Fraud.net.

27.     ERCS reasonably relied on Fraud.net's representations that Fraud.net's services perform as promised and would be sufficient to meet ERCS' needs and expectations.

28.     Concerned by Tony Ferrano's termination by Fraud.net shortly after he admitted Fraud.net's services would not perform as promised and would not meet ERCS' needs or expectations, ERCS asked to speak with John Ging and others at Fraud.net about the material discrepancy between the goods and services Fraud.net had promised, which should have met ERCS' needs and expectations, and what goods and services Fraud.net was seemingly able to provide (if any), which would not.

29.     On September 6, 2023, John Ging wrote an e-mail to ERCS stating, "I am trying to get an update and discuss next steps."

30. ERCS, through Chandler Chavis, replied by e-mail on September 8, 2023, stating, in pertinent part, "After careful consideration and internal discussion regarding the UBO and the[] services that are provided by Fraud.net, we have decided not to proceed further with your offerings. The services were not aligned with what was initially presented to us, and as such, they do not meet our specific needs. Given that we have not utilized any of your services, we kindly request a full refund of our payment as per the terms of our agreement."

31. The September 8 e-mail from Chandler Chavis was sent within what ERCS believed was the contractual period in which either party could cancel the Contract without cause, e.g., within 30 days of the "go live" date for the contracted goods and services. Regardless, ERCS' notice of cancellation was not "without cause," and was instead based on Fraud.net's misrepresentation of the goods and services it would provide and Fraud.net's attendant misrepresentation that ERCS's needs and expectations would be met pursuant to the Contract.

32. Rather than accept ERCS's notice of cancellation and refund request, Fraud.net, through John Ging, suggested the parties discuss the matter by telephone the following week, on or about September 14, 2023. On September 14, however, John Ging notified ERCS that he was unavailable, and requested the telephone call be rescheduled to the following week.

33. The parties were finally able to discuss ERCS' notice of cancellation and refund request on or about September 19, 2023. On that telephone call, Fraud.net, through John Ging and Kevin Shine, seemingly knew or understood the contracted goods and services would not meet ERCS' needs and expectations. On information and belief, the September 19 telephone call was recorded.

34. After the September 19 telephone call, Kevin Shine asked ERCS to share information about the alternative database ERCS had located that, unlike Fraud.net's services, would meet ERCS' needs and expectations, stating "[c]an you share the name or a landing page as I would like to get it added to our API marketplace for future use cases." Kevin Shine further said, "I've reached out to our finance team to verify the invoice and payment status," and "either John or myself will reach out to you by the end of the week."

35. Neither John Ging nor Kevin Shine ever "reach[ed] out" again, whether by the "end of the week" or to date.

36. As of October 12, 2023, Fraud.net still had not delivered any Professional Services or customer support to ERCS, and had not responded to ERCS' September 8 notice of cancellation and refund request.

37. Thus, on October 12, in a letter from their attorney to Fraud.net, ERCS again advised Fraud.net that, based on Fraud.net's non-performance and on Fraud.net's admission or understanding—through Fraud.net employees or representatives Tony Ferrano, Kevin Shine, John Ging, and others—that the contracted services would not perform as promised or needed, ERCS was requesting a refund as provided in paragraph 6(3) of the Master Agreement. (Ex. 2 hereto at ¶6(3) (allowing ERCS to "terminate the applicable SOW and refund that portion of any Fees paid to Fraud.net . . . that correspond to the allegedly defective Professional Services").)

38. Fraud.net failed or refused to refund any portion of the fees paid by ERCS to Fraud.net in consideration of Fraud.net's promised performance of Professional Services under the Contract. Instead, as it had before, Fraud.net insisted that principals of ERCS and Fraud.net should meet by telephone and discuss whether the Contract could still be performed by Fraud.net to ERCS' satisfaction.

39. Although ERCS principals agreed to the Fraud.net-requested meeting, and repeatedly corresponded with Fraud.net attempting to schedule it, Fraud.net failed or refused to respond or to meet with ERCS.

40. To date, Fraud.net has still failed or refused to refund any portion of the fees paid by ERCS to Fraud.net in consideration of Fraud.net's promised Professional Services under the Contract, none of which have been performed or provided.

### AS AND FOR A FIRST CAUSE OF ACTION
### FOR BREACH OF CONTRACT

41. ERCS incorporates by reference all allegations in paragraphs 1 to 40 as if fully set forth herein.

42. Under the Contract, Fraud.net agreed to provide, and ERCS agreed to purchase, specific Professional Services to ERCS, including but not limited to Fraud.net's KYC Service (minimum 60,000 calls), API Appstore, and Support Plan.

43. Fraud.net charged, and ERCS paid, $109,900 for the contracted KYC Service (minimum 60,000 calls), API Appstore, and Support Plan for the first year of the Contract's Initial Term.

44. After the Contract was signed, but before any contracted services were provided, Fraud.net "Customer Success Manager" Tony Ferrano admitted to ERCS that the Professional Services Fraud.net had contracted to provide ERCS would not perform as promised. When asked specially about the promised customized rules-based database and access to existing customer fraud-detection databases, Tony Ferrano stated, "Oh, no, we don't have that."

45. Tony Ferrano, John Ging, Kevin Shine, and others at Fraud.net, at various times in and around August and September 2023, admitted there was a material discrepancy between the goods and services Fraud.net had promised, which should have met ERCS' needs and

expectations, and the goods and services Fraud.net was seemingly able to provide (if any), which would not.

46. ERCS thus tendered to Fraud.net, on September 8, 2023, and again on October 12, 2023, a notice of cancellation and refund request, consistent with the Contract's terms.

47. Fraud.net has failed or refused to accept ERCS' notice of cancellation or to process ERCS' refund request.

48. Fraud.net has also failed or refused to provide ERCS with the contracted Professional Services.

49. As a direct and proximate result of Fraud.net's breach of the Contract and failure or refusal to comply with its contractual obligations, ERCS has suffered damages of in the amount of $109,900 plus pre-judgment interest at the statutory rate of 9% per annum.

## AS AND FOR A SECOND CAUSE OF ACTION
## FOR FRAUDULENT INDUCEMENT

50. ERCS incorporates by reference all allegations in paragraphs 1 to 49 as if fully set forth herein.

51. Based on Fraud.net's representations of the products and services it could provide, and Fraud.net's promises that ERCS' needs and expectations could be satisfied by Fraud.net with only minimal input required from ERCS, ERCS entered into a contract with Fraud.net.

52. Fraud.net knew, prior to ERCS agreeing to contract with Fraud.net, that Fraud.net's services would not perform as promised and would not be sufficient to meet ERCS' needs or expectations.

53. Fraud.net misrepresented to ERCS that Fraud.net's services would perform as promised, and further misrepresented that Fraud.net's services would be sufficient to meet

ERCS' needs and expectations, for the purpose of inducing ERCS to enter into a contract with Fraud.net.

54. ERCS reasonably relied on Fraud.net's representations that Fraud.net's services would perform as promised and would be sufficient to meet ERCS' needs and expectations.

55. Even though ERCS would never have entered into the Contract with Fraud.net but for Fraud.net's fraudulent representations that its services would be sufficient to meet ERCS' needs and expectations, on information and belief Fraud.net will argue that ERCS' recovery of damages for Fraud.net's misconduct is limited by paragraph 6(3) of the Master Agreement. Limiting ERCS' recovery to only "that portion of any Fees paid to Fraud.net . . . that correspond to the allegedly defective Professional Services" will not make ERCS whole.

56. As a direct and proximate result of Fraud.net's fraudulent inducement, ERCS has suffered damages in an amount to be proven at trial.

57. As a direct and proximate result of Fraud.net's fraudulent inducement, ERCS is also entitled to punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ERCS respectfully requests that the Court enter judgment against Fraud.net, and in favor of ERCS, as follows:

1. Declaring the contract terminated, effective no later than October 12, 2023, and ordering Defendant Fraud.net to pay monetary damages to ERCS in the amount of $109,900;

2. For additional monetary damages as allowed by law;

3. For punitive damages as a result of Fraud.net's intentional misconduct;

4. For reasonable attorney fees and costs incurred in bringing this action;

5. For pre- and post-judgment interest as allowed by law; and

6. Such other and further relief as the Court deems just and proper.

Dated this 22nd day of October, 2024.

Respectfully submitted,

**STRONG & HANNI, P.C.**

/s/ Darcy M. Goddard
Darcy M. Goddard (NY Bar No. 4342382)
Ryan P. Atkinson (pro hac vice admission papers forthcoming)
102 South 200 East, Suite 800
Salt Lake City, Utah 84111
Telephone: 801.532.7060
E-mail: ratkinson@strongandhanni.com
           dgoddard@strongandhanni.com


**COZEN O'CONNOR**

/s/ Michael B. de Leeuw
Michael B. de Leeuw (NY Bar No. 2854131)
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: 212.908.1331
E-mail: mdeleeuw@cozen.com